UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TRACY A. LADRA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 3:17-CV-471-PPS/MGG |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Tracy Ladra appeals the Social Security Administration's decision to deny her application for disability insurance benefits. An administrative law judge ruled Ladra was not disabled within the meaning of the Social Security Act. Ladra challenges that decision on two grounds. First, she disputes the ALJ's residual functional capacity (RFC) finding. Second, Ladra takes issue with the ALJ's evaluation of her daily living activities. Neither issue is grounds for reversal.

The ALJ found that Ladra had the following severe impairments: degenerative disc disease with cervical and lumbar stenosis and headaches; hypertension; pseudo seizures; bipolar disorder; and borderline personality disorder. [Tr. 19.][1] In his opinion, the ALJ provided a detailed description of the medical evidence in the record which need not be repeated here. [*See* Tr. at 19-26.]

---

[1] Citations to the record will be indicated as "Tr. __" and indicate the pagination found in the lower right-hand corner of the record found at DE 26.

Before diving into Ladra's arguments, let's go over some basics about my role in reviewing an ALJ's decision. I am not supposed to determine from scratch whether or not Ladra is disabled. Rather, I only need to determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence. *See* 42 U.S.C. §405(g); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).

My review of the ALJ's decision is deferential. This is because the "substantial evidence" standard is not a particularly rigorous one. In fact, it's less than a preponderance-of-the-evidence standard. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). There certainly has to be more than a "scintilla" of evidence. *Id.* So in conducting my review, I cannot "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nonetheless, the review is a light one and the substantial evidence standard is met "if a reasonable person would accept it as adequate to support the conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

**The RFC Determination**

The first issue raised by Ladra is whether the RFC was properly determined by the ALJ. RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). The RFC is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do
2

work-related activities." SSR 96-8p, 1996 WL 374184, at *3.  In assessing the RFC, the ALJ should consider all of the medically determinable impairments.  20 C.F.R. § 404.1545; SSR 96-8p, 1996 WL 374184, at *3, 7.  It is the claimant's responsibility to provide medical evidence showing how her impairments affect her functioning.  20 C.F.R. § 416.912(a).

While the ALJ need not mention every piece of evidence in the record, the RFC determination must provide an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled.  *Zblewski v. Astrue*, 302 Fed. Appx. 488, 492 (7th Cir. 2008); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).  The regulations have explained that an ALJ should consider limitations and restrictions imposed by a person's impairments, even those that are not severe, because while "a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may - - when considered with limitations or restrictions due to other impairments - - be critical to the outcome of a claim."  SSR 96-8p, 1996 WL 374184, at *5.

Here is the detailed RFC arrived at by the ALJ:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally lift and carry up to 20 pounds and frequently up to 10 pounds; can sit, stand, and walk for 2 hours each at one time and for up to 6 hours in an 8 hour day; can frequently reach overhead with the right and left hand and frequently push or pull and can continuously reach all other, handle, finger, and feel bilaterally. The claimant can frequently operate foot controls bilaterally.  She can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs and occasionally kneel, crouch, and crawl.

> The claimant can frequently balance and stoop. The claimant can never work at unprotected heights, around moving mechanical parts, or operate a motor vehicle. She can occasionally tolerate exposure to vibrations and frequently to humidity, wetness, dusts, odors, fumes, pulmonary irritants, extreme cold, and extreme heat. Noise is moderate, office. The claimant is capable of managing simple, routine work tasks mentally, within a work environment with only occasional and uncomplicated workplace interactions with routine and predictable workplace stressors. The claimant is able to understand, remember, and carryout simple instructions and to make judgments on simple work related decisions, to respond to usual work situations and to changes in a routine work setting. The claimant is limited to occasional interaction with coworkers and supervisors and the public. The claimant requires work free of production rate pace but she could have an end of day production quota.

[Tr. at 20-21.]

Ladra's skeletal brief challenging the RFC determination fails to connect the dots. Instead, she simply provides a sort of laundry-list of non-severe impairments that she says the ALJ failed to adequately take into account in the RFC. The checklist includes headaches, occipital neuralgia, bipolar disorder, Tietze's disease, brachial neuritis, and any limitations relating to lighting/photophobia. [DE 24 at 12-13.] Providing a checklist is not the same as providing analysis of the evidence in the record that the ALJ allegedly ignored. Ladra has failed to elaborate on how these impairments should have been considered or how that consideration would result in a change of her limitations or a finding of disability. *Id.*

In any event, contrary to Ladra's claim, I think the ALJ did a commendable job analyzing her combined impairments and substantial evidence supports his RFC findings. Let's start with the first impairment on Ladra's list: the headaches. The ALJ

4

*did* consider Ladra's headaches. He noted her complaints about headache-related symptoms, and that she was diagnosed with chronic headaches, then alternatively, migraines with cluster headaches. [Tr. at 21, 23, 1494, 1497, 1627.] The ALJ discussed at length that Ladra treated her symptoms with a series of medications and received depro-medrol and lidocaine injections every three months, which Ladra reported "were helpful." [Tr. at 23, 1631-32, 1640-41.] The ALJ also noted that when Ladra presented for neurological evaluations in January and April 2016 after occipital nerve block injections, her physical examination findings were unremarkable. [Tr. at 23, 1629-30, 1634-35.]

The ALJ also gave great weight to the opinion of Dr. Lee Fisher, a medical expert who reviewed the record and completed a medical source statement in March 2016. [Tr. at 24-25, 1562-70.] Dr. Fisher specifically considered Ladra's headaches [Tr. at 1562-63], and the ALJ gave great weight to his opinion because he had the benefit of reviewing the most complete evidence of record, and his opinion was supported by clinical findings in the record "and adequately considers the combination of the claimant's mental and physical impairments as it relates to environmental limitations." [Tr. at 25.] The ALJ found, consistent with Dr. Fisher's opinion, that Ladra could perform a reduced range of light work, with the postural, manipulative, environmental, and mental limitations that were included in the RFC. [Tr. at 20-21.]

To the extent Ladra declares that her headaches are "work preclusive" and she should have a lighting/photophobia restriction, she only cites to three pages in the

5

medical record. [DE 24 at 12, citing to Tr. at 969, 1056, 1059.] All three documents are from the NueroClinic (dated April 6, 2015, April 21, 2015, and May 5, 2015), and provide verbatim summaries, with some new information added in the later visits. [Tr. at 969, 1059, 1056.] The latest document, dated May 5, 2015, states that in the past, Ladra had almost daily, severe headaches associated with photophobia, but by April 2015, after the occipital nerve block treatment, "patient is doing well." [Tr. at 1056.] While the headaches came back again in April 2015, chemical denervation of the cervical nerves was apparently successful. [Tr. at 1056.] So basically, Ladra's only support for her argument that the ALJ did not fully consider her headaches is by citing a couple of documents that state that although she had headaches in the past, she was doing well after treatment. This is not sufficient. *See Contreras v. Berryhill*, No. 16 CV 9037, 2017 WL 3592699, at *7 (Aug. 21, 2017) (affirming the Commissioner's decision where claimant did not point to any evidence of record suggesting she lacked the RFC to perform at the level determined by the ALJ, or evidence that her migraine headaches would result in limitations beyond those set out in the RFC).

Next on the list is Ladra's claim that the "RFC contains insufficient limitations in relation to bipolar disorder." [DE 24 at 12.] This time she doesn't cite to *anything* in the medical record. Ladra does cite the vocational expert who testified that an individual cannot be off task more than 10 percent of a workday. [DE 24 at 12.] But because Ladra has not pointed me to any *evidence* showing that she would be off task more than 10 percent of a workday, this argument is neither here nor there. It is Ladra's

6

responsibility to tell me where evidence can be found in an administrative record spanning more than 1600 pages. It is neither efficient nor reasonable for Ladra to expect the court to do the foraging for her. *See Hermann v. Astrue*, No. 07 C 6914, 2010 WL 356233, at *2 (N.D. Ill. Feb. 1, 2010) (citation omitted) (stating judges are not "archaeologists consigned to excavating masses of paper in search of possibly revealing information that might benefit the party whose briefs provided no clue of where to dig.").

What I see from the record is that the ALJ spent a significant amount of time analyzing Ladra's bipolar disorder. [Tr. at 24-26.] He considered Ladra's treatment for bipolar disorder and medication management, the progress notes showing she had a positive response to treatment, the opinion of Dr. Kravitz, a psychological expert whose opinion was consistent with the treatment notes from the Swanson Center and mental status examinations, the state agency psychological consultant opinions that were also consistent, and Ladra's treating neurologist, Dr. Kincaid, who opined there was no neurological basis for any limitation. [Tr. at 24-26, 1479-87.] The ALJ's decision reflects that he carefully reviewed the evidence relating to Ladra's bipolar disorder and included appropriate work-related limitations in his RFC finding.

Finally, Ladra claims the ALJ ignored lines of evidence associated with Tietze's disease[2] and brachial neuritis[3]. While there are some indications in the record that Ladra was diagnosed with Tietze's disease [868, 871, 877, 883, 1257], Tietze's shows up only in a list of multiple diagnoses. Ladra has not pointed me to anything in the record showing any symptoms of this disease, or how it might impact her ability to work. The same goes for brachial neuritis - it appears as a listed diagnosis under clinical impressions in the medical record, but Ladra has not shown anything in the record about how this allegedly affected her, what symptoms are attributable to it, or how it affects her ability to work. An ALJ "is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions." *Terry*, 580 F.3d 471, 475 (7th Cir. 2009). In this case, the ALJ did adequately consider the combination of Ladra's impairments, and provided a logical bridge between the medical evidence and his conclusions in reaching the RFC.

**Daily Living Activities**

Ladra also argues the ALJ improperly overemphasized her daily living activities. First, she contends the ALJ "glosses over the fact that Plaintiff accomplished her daily

---

[2] Tietze's syndrome, which is also called costochondritis, is a condition of unknown origin that is characterized by inflammation of the costochondral (rib) cartilage. *See* Definitions of "Tietze's syndrome" and "costochondral," available online at https://www.merriamwebster.com/medical/Tietze's syndrome and https://www.merriamwebster.com/medical/costochondral (last visited November 14, 2018).

[3] According to Hopkins Medicine, this is a form of peripheral neuropathy that affects the chest, shoulder, arm and hand. See online definition at:
https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/brachial_neuritis (last visited on November 14. 2018).

goals only by interspersing significant rest periods or unpredictable headache downtimes with periods of low exertional activity." [DE 24 at 14.] This statement in Ladra's brief is not supported by a single citation to the administrative record. In other words, Ladra cites to nothing to support her claim that she had to take rest periods when she was trying to accomplish certain tasks, or that her headaches interrupted daily activities. As I noted above, this case involves a hefty administrative record. To repeat, it's Ladra's responsibility to direct the court to the evidence that supports her assertions.

In any event, it is hardly true, as argued by Ladra, that the ALJ "glossed over" her need for unpredictable downtime due to headaches. In fact, he expressly acknowledged it when discussing Ladra's daily living activities:

> The claimant alleges she is unable to work due to chronic back pain, headaches, anxiety, and depression that limit her ability to stand, lift, bend, walk, sleep at night, concentrate, and get along with others. The claimant reports that she has to use an alarm to remember to take her medications, is able to weed flowers, do laundry, clean the house, go outside, drive a car, shop in grocery stores, attend Sunday church service and pay her bills. The claimant testified in 2015 that she has daily headaches that can last from 6 hours to all day and she lays in a dark room or goes to the emergency room. She also testified in 2015 that she was using a walker 50% of the time in her house due to back pain, but that she was able to drive and shop using a cart at the store.

[Tr. at 21. (citations omitted).] So after listing her various daily activities, the ALJ specifically noted that her headaches required her to take extended breaks. But as discussed above, the ALJ then went on to address Ladra's headaches and her successful treatment. [Tr. at 23.]

9

Ladra also states the ALJ evaluated and overemphasized her daily activities. She says that this violates the so-called "*Bjornson* principles" which requires a remand. [DE 24 at 14-15.] This is certainly a hot topic lately in the social security world. The Seventh Circuit has criticized ALJs expressing doubt about claimants' credibility, stating "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer" *Hughes v. Astrue*, 705 F.3d 276, 278–79 (7th Cir. 2013) (quotation and citations omitted), and that "[t]he failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also Herrold v. Colvin*, No. 2:13-cv-360, 2015 WL 1243293, at *6 (N.D. Ind. Mar. 17, 2015) ("[T]he Seventh Circuit has repeatedly criticized credibility determinations that are based on a plaintiff's ability to take care of his personal hygiene, children, or household chores, as these alone are not sound bases for a credibility determination.)".

But unlike the situations in *Bjornson* and those other cases, Ladra does not argue that the ALJ discounted her subjective complaints or discredited her credibility because of her daily living activities. Indeed, there is no evidence that the ALJ improperly used Ladra's daily activities in his determinations. Although he did find that Ladra's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence, the ALJ then

went on for 5 pages detailing the medical evidence (including successful treatment, clinical findings, medication, and opinions of two doctors plus the state agency medical consultants), in supporting his findings. [Tr. at 22-26.] I cannot say that he improperly weighed Ladra's daily living activities.

Finally, Ladra also argues the ALJ's analysis was flawed because "[i]t uses Sunday Church attendance against Plaintiff." [DE 24 at 14.] She cites *Wisconsin v. Yoder*, 406 U.S. 205 (1972), in support of her argument that the "ALJ's reliance on religious worship to bolster the ALJ's daily activities produces a chilling effect and places an unconstitutional restraint on the free exercise of religion." [DE 24 at 14.] *Yoder*, a school attendance case which dealt with the Amish faith and the freedom to exercise religion, is completely inapplicable here. It seems to me that there was nothing insidious about the ALJ merely listing Ladra's church attendance as one of the several activities in which she engages. Other courts have found the same. *See Swank v. Berryhill*, No. 1:16-cv-416, 2017 WL 6277558, at *6 (N.D. Ind. Dec. 11, 2017) (finding that "the ALJ did not overemphasize or give too much weight to Plaintiff's church attendance, did not insinuate that attending religious service was a reason that Plaintiff was not disabled, or find that her attendance at church meant she had no social functioning impairments."); *Davis v. Comm'r of Soc. Sec.*, No. 16-13495, 2018 WL 1150243, at *4 (E.D. Mich. Mar. 5, 2018) ("The ALJ's reference to church did not implicate the religion clauses of the First Amendment; it merely was a comment on what the plaintiff was able to do, and did not trench upon her freedom to worship (or not) as she pleased.").

In sum, the ALJ discussed all of the relevant medical evidence, and Ladra has not pointed to any evidence that the ALJ impermissibly failed to consider. I am satisfied that the ALJ's determination was supported by substantial evidence.

**Conclusion**

The final decision of the Commissioner of Social Security denying plaintiff Tracy Ladra's application for disability insurance benefits is **AFFIRMED**.

The Clerk shall enter judgment in favor of Defendant and against Plaintiff.

**SO ORDERED**.


ENTERED: November 26, 2018.

/ s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**